Jerome A. Busch, Esq. (SBN 97317)
**VOGT | RESNICK | SHERAK, LLP**
4400 MacArthur Blvd., Suite 900
P.O. Box 7849
Newport Beach, CA 92658-7849
Tel:   (949) 851-9001
Fax:   (949) 833-3445
E-mail: jbusch@vrslaw.net

Attorneys for Defendant, Carmen Luera

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No: CR 13-00555-DDP |
|---|---|
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM OF CARMEN LUERA** |
| CARMEN LUERA, | **TIME:**   1:30pm |
| Defendant. | **DATE:**   November 23, 2015 |
| | **DEPT:**   Courtroom of the Hon. Dean D. Pregerson |

Carmen Luera, by and through his undersigned counsel, respectfully submits this memorandum to assist the Court in determining an appropriate sentence.  For the reasons set forth below, Ms. Luera departs from the sentencing guideline computation and recommendation set forth in the Presentence Report ("PSR") and respectfully submits that an appropriate sentence in this case would be probation with terms as determined by the Court.

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT**                                                                 1

**ANALYSIS OF § 3553(a) FACTORS**                                                         2

   I.     REQUIRED SENTENCING CONSIDERATIONS

          FOLLOWING BOOKER, GALL, AND KIMBROUGH                          2

   II.    THE ADVISORY GUIDELINES CALCULATION                             4

       A.    Advisory Guidelines Range and Downward Departure       4

            1.    Tax Loss Calculation                                 4

            2.    Specific Offense Characteristics                     5

            3.    Mitigating Role                                      6

            4.    Relevant Conduct                                     7

       B.    The Court Should Impose a Non-Guidelines Sentence No

          Greater Than Necessary to Accomplish the Goals of §

          3553(a) in This Case                                       9

  III.   CONSIDERATION OF ALL OF THE § 3553(A) FACTORS

        SUPPORTS THE CONCLUSION THAT A SENTENCE

        BELOW THE ADVISORY GUIDELINES RANGE IS

        APPROPRIATE                                                   10

       A.    Section 3553(a)(1): History and Characteristics of Carmen   10

          Luera

       B.    Section 3553(a)(1): Nature and Circumstances of the         11

          Offense

**CONCLUSION**                                                                           12

**SENTENCING MEMORANDUM OF CARMEN LUERA**

# TABLE OF AUTHORITIES

## Cases

*Rita v. United States*, 551 U.S. 338 (2007)...................................................................3, 4

*United States v.Farha,* Case 8:11-cr-00115-J Case 8:11-cr-00115-JSM-MAP
  (Amicus Brief)...........................................................................................................7

*United States v. Adelson*, 441 F. Supp. 2d at 509 ......................................................9, 11

*United States v. Booker*, 543 U.S. 220 (2005) ................................................................2

*United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006)......................................11

*United States v. Kimbrough*, 128 S. Ct. 558, 570 (2007) .........................................2, 3, 9

*United States v. Ruff*, 535 F.3d. 999 (9th Cir., 2008) ...............................................10

## Statutes

18 U.S.C. § 3553(a) ..................................................................................................3, 4, 12

18 U.S.C. § 3553(a)(1)................................................................................................11

18 U.S.C. § 3553(a)(4) & (5) ....................................................................................11

## Sentencing Guidelines

2015 *USSC Guidelines Manual* (USSG) .......................................................................4

USSG Section 1B1.3, *Application Note 4(C) (vii)* ......................................................8

USSG Section1B1.3, *Application Note 3 (B)* ...............................................................8

USSG Section 3B1.2, *Application Note 3(A)* ..............................................................6

USSG Section 3B1.2, *Application Note 3(A) and (C)* .................................................6

USSG Section 2T1.4..................................................................................................4

USSG Section 2T4.1(b)(1)...........................................................................................5

## Other Authorities

Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds*,
  20 Federal Sentencing Reporter 167, No. 3, (2008) ................................................6

## **PRELIMINARY STATEMENT**

Carmen Luera ("Carmen") was dead broke.  For better or worse she supported a husband, two grown sons, one of her son's girlfriend and child, a niece and had been supporting a nephew.  Her job as a letter carrier at the Post Office barely covered the monthly bills.  She had a high school education but knew that she was on the thin side of below average.  There would never be a better job than what she had. Carmen Luera was and remains an ordinary mom, housewife and letter carrier who became swept up in untoward events.   As financial difficulties unfolded and became more serious in 2008, she was the sole support of her family.  Her husband was disabled and her sons each failed at businesses they attempted to start.  Even so, she still took in the girlfriend and granddaughter along with a niece and nephew to live in her family home because they had no place else to go.  She needed money for the household and she needed it bad.

As she worked her postal route she came to know Nancy Hilton ("Hilton") who told Carmen that she had a tax preparation business.  In early 2008 Hilton offered Carmen a chance to work in the business assisting in the preparation of tax returns. Carmen knew nothing about return preparation but agreed, eager for extra money for the family.   She started stopping by Hilton's after her route was finished and initially began performing menial tasks.

As Carmen learned to input data in Hilton's tax return program she became sufficiently involved in the fraudulent tax scheme to be part of the general conspiracy, but not enough to be a central figure, strategist or planner.   As an analogue to her letter carrier duties she did what she was told and what could be learned through continuous repetition.   Independent implementation of thought or action was beyond her capabilities and she was not tasked with any duty beyond the repetitive normal of the operation.  For her efforts she was paid $19,930 for over a year's work.

In the end it was extraordinary that she would find herself in conspiracy and extraordinary that she would accept such risk for so little. But ordinary in that her part would be so mundane and also ordinary in that her repetitive tasks in the service of others was so meager, yet sufficient to render her inducted into the joint enterprise.

The central fact is that Carmen said nothing, no matter what little she observed, no matter what she was asked to do.  She participated without complaint, took what money was offered and went her way.  Conspiracy by low-end participation without objection.  There is no question of her guilt.  The need for money for the household, combined with a willing acquiescence in the fraudulent preparation of tax returns brought her within the ambit of the conspiracy. This need for money overcame her judgment and she turned aside from what she knew to be right and did what was expedient.

## ANALYSIS OF § 3553(a) FACTORS

### I.  REQUIRED SENTENCING CONSIDERATIONS FOLLOWING *BOOKER, GALL,* AND *KIMBROUGH*

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Mandatory Sentencing Guidelines system violated the Sixth Amendment. Pursuant to the *Booker* remedial opinion (and as further explained in subsequent Supreme Court cases), the sentencing court is to apply the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." *United States v. Kimbrough*, 128 S. Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The statute provides that, in determining the appropriate sentence, the Court is to consider a number of factors. The first factor, reflecting the critical component of any sensible sentencing regime that the district judge "make an individualized assessment based on the facts presented," is "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 128 S. Ct. 586, 596-97 & n.6 (2007). The second factor requires consideration of the "general purposes of sentencing," that is, imposition of a sentence reflecting the seriousness of the offense, promoting respect for the law, and providing "just punishment" as well as specific and general deterrence. *Kimbrough*, 128 S. Ct. at 570. The Court must also consider the sentencing range established by the Guidelines, as well as "any pertinent policy statement" issued by the *Sentencing Commission* (§ 3553(a)(4), (5)).

Although a district judge "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall*, 128 S. Ct. at 596, the advisory Guidelines are only one of the factors to be considered in imposing sentence, *Id.* at 602. The district court must make an individualized evaluation of the facts and circumstances before it. In so doing, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. *Rita v. United States*, 551 U.S. 338 (2007). The Court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring) and is specifically to avoid slavish resort to advisory Guideline computations.

## II. THE ADVISORY GUIDELINES CALCULATION

### A. Advisory Guidelines Range and Downward Departure

As noted, the Court is directed to begin the sentencing proceeding by correctly calculating the applicable Guidelines range, including applicable downward departures. *Gall*, 128 S. Ct. at 596 (citing *Rita v. United States*, 127 S. Ct. 2456, 2465 ("sentencing judges, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines," and may then determine that the Guidelines sentence should not apply because, for example, it "fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless")).

However, this case is unusual in that the 2015 *USSC Guidelines Manual* (USSG) has been recently amended, effective November 1, 2015, and applies to this case. The Defendant respectfully submits that the Tax Loss computation along with Relevant Conduct in the Pre-Sentence Report ("PSR") must be recalculated in order to comply with the amended Guidelines.

1. **Tax Loss Calculation.** As noted above, the USSG Section 2T4.1. Tax Table for utilizing the Tax Loss for computing the Offense Level has been modified for inflation. The PSR computed the Guidelines by characterizing the offense as more appropriate under USSG §2T1.4. *Aiding, Assisting, Procuring, Counseling, or Advising Tax Fraud.* The PSR in the section <u>Offense Level Computation</u>, paragraph 29, determined that the overall attempted loss amount for the conspiracy was $2,882,837, and used that number for the Tax Loss instead of the amount of overall refunds paid by the Internal Revenue Service ("IRS") in the amount of $1,354,521. However, under the current Section 2T4.1 a Tax Loss of $2,882,837 results in an Offense level of 22 for the correct PSR number is accepted, rather than level 24 as used in the PSR. The adjustment to level 22 is merely arithmetic and does not take into account the relevant conduct concerns of amended Section 1B1.3 on base offense

levels and specific offense characteristics. As set forth below, the amended Relevant Conduct factors should result in a substantially reduced Offense Level.

**2.   Specific Offense Characteristics.**   In paragraphs 30 and 31 the PSR argues that a two level enhancement should be applied pursuant to USSG Section 2T4.1(b)(1) because Carmen allegedly derived a substantial portion of her income as a result of participation in the tax scheme and was engaged in the business of tax preparation. As to the "substantial portion" requirement of USSG Section 2T4.1(b)(1)(A), the PSR inaccurately determined what was a "substantial" portion of Carmen's income.  Carmen received $19,939 of income for 16 months of work in Hilton's tax preparation business. That amount equals $1,246.19 per month of additional gross income from her illegal activities.  As more fully set forth in the Statement of Carmen Luera attached as Appendix "1", she received a gross monthly amount of wages and government support for her niece in the total amount of $5,562.82.   The $5,562.82 plus the monthly $1,246.19 received from the conduct results in a total amount received of $6,809.01.   Therefore, $1,246.19 received from the conduct is only equal to 18.3% of Carmen's gross income.  This amount should not be considered "substantial" for purposes of USSG Section 2T4.1(b)(1)(A).

In addition the PSR suggests that USSG Section 2T4.1(b)(1)(B) should apply in that Carmen was in the business of preparing or assisting in the preparation of tax returns.  While it is true that Carmen prepared a number of tax returns, she was in the business of being a letter carrier, not a tax preparer.  In fact, if Carmen had attempted to claim a separate business as a tax preparer on a tax return the IRS would have denied her attempt and such a claim would become part of the offense characteristics and discussed in the PSR.  Carmen was not in the business of tax preparation and the two (2) level enhancements should be removed.

**3.   Mitigating Role.**   With respect to measuring culpability, in the past the Guidelines question has been whether that determination turns only on the conduct of

co-conspirators in the case at hand, or whether a court is also to look at other cases involving those who have committed similar crimes.  The Sentencing Commission in the amendment of the *Application Notes* for USSG Section 3B1.2, Mitigating Role has now determined that courts are only to look at the relative culpability of co-conspirators in the case before them, rather than engage in a review of similarly situated defendants in other cases.

The recent amendment of the *Application Notes* for USSG Section 3B1.2, is applicable in this case. The section states that if a defendant is a minimal participant, decrease by 4; if a minor participant, decrease by 2; and if the case falls between minimal and minor, decrease by 3.  Carmen respectfully submits that her case as amplified in *Application Note 3(A) and (C)* should result in a downward adjustment of 3 levels.

*Application Note 3(A)* suggests that there should be a range of adjustments for a defendant that is substantially less culpable in the criminal activity. The second example is especially pertinent to this case and is as follows:

> *Likewise, a defendant who is accountable under §1B1.3 for a loss amount under §2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline.*

In addition, *Application Note 3(C) (v)* under Fact-Based Determination states as follows:

> *(v) The degree to which the defendant stood to benefit from the criminal activity.*
>
> *For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.*
>
> *The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an*

*adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.*

In this case Carmen was a part time employee in addition to her fulltime job as a letter carrier. She was simply being paid to perform a task and had no proprietary interest in Hilton's tax preparation business. Considered as a whole, the factors set forth in the *Application Notes* when applied to the facts set forth in the PSR and the Statement of Carmen Luera in Appendix "1" strongly suggest a downward departure is warranted. The facts also suggest that Carmen falls somewhere between a minimal and minor participant and, therefore, should receive a downward departure of three (3) levels.

**4.** **Relevant Conduct.** As the Court is aware, in financial and tax cases, the arithmetic loss amount drives the Guidelines calculation. Carmen respectfully submits that, because in the past the Guidelines range has been determined solely by the loss amount to the virtual exclusion of all of the other § 3553(a) factors, it does not easily produce a fair and just sentence in this case, much less one that is "no greater than necessary" to achieve the goals of sentencing . *See Amici Brief* in Support of Defendants, filed in *United States v.Farha,* Case 8:11-cr-00115-J Case 8:11-cr-00115-JSM-MAP Document 859 Filed 05/12/14SM-MAP, attached as Appendix "2". However the recent amendment of USSG Section 1B1.3 has substantially altered the Guidelines with respect to the scope of accountability for jointly undertaken criminal activity. USSG Section1B1.3 in *Application Note 3 (B)* discusses the concept of "scope" and states in pertinent part:

> *Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).*

1    *Application Note* 4 provides examples to illustrate accountability and in

2    subsection *4(C)* examples discuss the requirement that the conduct be within the

3    scope of jointly undertaken activity and in furtherance of that activity.   The example

4    in *Application Note* 4(C) (vii) is particularly pertinent and states as follows:

> *(vii) Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams).*

11    In this case Carmen is not the prime person in the conspiracy and was not

12    informed or had knowledge of the full extent of the conspiracy and, therefore, should

13    not be accountable for the full amount of intended loss.  Her agreement with Hilton,

14    as the prime figure in the scheme, was to do as she was told and prepare the limited

15    number of false tax returns which were provided to her to complete the data entry.

16    She had no agreement or conduct to suggest that she was part of the larger conspiracy

17    with respect to the total number of returns prepared or submitted.   Carmen did,

18    however, allow her bank account to be used as a repository for some IRS refunds

19    obtained.  Once again, Caren had no idea of the amount of refunds resulting from the

20    tax scheme or even where all the funds were held.  She only knew her segment of the

21    deposits and only because she was to be paid out of the retention of a portion of those

22    deposits.

23    Viewed in its entirety through the facts in the PSR, Carmen's relevant conduct

24    should be limited to that portion of the conspiracy within the scope of her

25    participation rather than culpability for the full amount of the intended loss.

**B.**   **The Court Should Impose a Non-Guidelines Sentence No Greater Than Necessary to Accomplish the Goals of § 3553(a) in This Case**

This Court's authority "to reject . . . the advice of the Guidelines," *Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring), and to impose a non-Guidelines sentence based on all of the § 3553(a) factors has particular relevance here. As was the case with the crack versus powder cocaine Guidelines considered in *Kimbrough*, the Sentencing Commission's treatment of loss in fraud and tax cases is not rooted in either "empirical data" or "national [sentencing] experience," and the resulting advisory Guidelines can yield sentences greater than necessary to achieve the goals of sentencing.   Where, however, the Sentencing Commission abrogates this reasoned evaluative role, the result in individual cases may well be sentences violative of the statute. *Kimbrough*, 128 S. Ct. at 574.   Moreover, as with the crack/powder, weight-based scheme discussed in *Kimbrough*, tying the tax Guideline ranges to the single sentencing enhancement of economic loss, frequently yields results to the exclusion of the other statutory goals of sentencing. See *Kimbrough*, 128 S. Ct. at 575. These infirmities have been cited as warranting imposition of a non-Guidelines sentence. *See*, e.g., *United States v. Adelson*, 441 F. Supp. 2d at 509 ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of the drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.") (citing Second Circuit Judge Cabranes, in *Fear of Judging*, at 53 (concluding that the Commission has never presented empirical evidence or substantial argument to support the proposition that its rules achieve, even imperfectly, any of the four well-established possible objectives of criminal sentencing)).

This result is not rational, implying as it does that all such defendants should

presumptively be punished alike. It also runs afoul of the requirement of § 3553(a) and recent Supreme Court cases that each offender and offense be assessed individually. Accordingly, Carmen submits respectfully that the advisory Guidelines sentence in her case – driven, primarily by the Tax Loss amount to the virtual exclusion of all other statutory factors – is an irrational and unnecessary result, one that ignores the requirement of individualized sentencing and the general sentencing goals set forth in §3553(a). *See United States v. Ruff*, 535 F.3d. 999 (9th Cir., 2008).

## III. CONSIDERATION OF ALL OF THE § 3553(A) FACTORS SUPPORTS THE CONCLUSION THAT A SENTENCE BELOW THE ADVISORY GUIDELINES RANGE IS APPROPRIATE

### A. Section 3553(a)(1): History and Characteristics of Carmen Luera

Carmen has submitted no psychological profile, no addictions, no attempt to "explain" her criminal behavior only acceptance of responsibility for her actions and unfailing co-operation. Carmen's decision to co-operate with the government occurred at a very early stage of the government's investigation and materially advanced the investigation over the course of time.   The nature and extent of Carmen's cooperation will be more fully addressed by the government in its papers.

The Second Circuit has recognized that, in considering the "history and characteristics of the defendant" under § 3553(a)(1), district courts should consider whether the defendant made efforts to cooperate, "even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. 5K1.1 ('non-5K cooperation')." *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006). Carmen's willingness to cooperate with the government and her decision to enter into a plea agreement are factors, among many, that warrant imposition of a non-Guidelines sentence independent of any Section 5K1.1 decision.   In sum, Carmen's acceptance of responsibility was prompt, unqualified and productive.   Her guilty plea, her

cooperation with the government, her extraordinary acceptance of responsibility, taken together, even before consideration of other § 3553(a) factors, support imposition of a sentence below that calculated under the advisory Guidelines.

### B.   Section 3553(a)(1): Nature and Circumstances of the Offense

Just as the Court is to "consider every convicted person as an individual," so, too, must the Court evaluate "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S. Ct. at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). The nature and circumstances of Carmen's offense is, she respectfully submits, more nuanced and more mixed as suggested in the PSR. *See, United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006). As a result, the factors and considerations in her case all support a sentence well below the advisory Guidelines

### CONCLUSION

For the foregoing reasons, Carmen Luera respectfully submits that all of the goals set forth in 18 U.S.C. § 3553(a) can and will be fulfilled by a sentence of probation, as modified by the Court for the reasons set forth herein.

DATED: November 2, 2015                    Respectfully submitted,

**VOGT | RESNICK | SHERAK, LLP**

Attorneys at Law

*/s/ Jerome A. Busch*
JEROME A. BUSCH
Attorney for Carmen Luera

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all case participants.

DATED: November 2, 2015          Respectfully submitted,

**VOGT | RESNICK | SHERAK, LLP**

Attorneys at Law

*/s/ Jerome A. Busch*
JEROME A. BUSCH
Attorney for Carmen Luera

:

APPENDIX "1"

STATEMENT   OF   CARMEN   LUERA

I, Carmen Luera, have asked to provide this statement to the Court for what I say plainly is the truth of what I did.

1. What has been written about my background and family in the Presentence Report ("PSR") remains true to this day. I was raised in a simple working class family, but a family which obeyed the law, teaching me values and to follow rules. Although I was able to finish high school, it was very difficult for me to learn math and to write well and, as a result, my attorney has assisted me in placing my thoughts in writing for this statement.

2. I have brought shame on my family for what I have done and have jeopardized their well being through my actions. I willingly joined with Nancy Hilton at the beginning of 2008 in her tax preparation business in Moreno Valley.. At first I was unaware of the tax refund scheme and only entered tax return data in a computer program for tax returns, but soon enough I learned that the business was obtaining fraudulent tax refunds from the preparation of false tax returns. When I found out I did nothing and what is worse, I involved my two sons in the business of obtaining false tax returns.

3. I would meet with individuals who wanted their tax returns prepared and would provide them with the option of using false information in the preparation of their tax returns to generate larger refunds for the clients using the false information. After I had entered the false information in the program I would give the false information to Nancy Hilton for electronic submission to the Internal Revenue Service ("IRS"). In addition, I allowed Nancy Hilton to deposit funds from the fraudulent tax refunds into my bank account in order to return the funds to her in cash.

4. I was not paid on an ordinary weekly or monthly basis but received payment by being

allowed to keep a portion of the fraudulent tax refunds which had been deposited into my bank account. I continued in this activity until April of 2009 and during the course of those 15-16 months I was allowed by Nancy Hilton to keep approximately $19,939 of the tax refunds as payment for my tax preparation activities. I willingly kept the money and also prepared false joint tax returns for my husband and myself to hide the $19,939 in income that I received.

5. After the end of the 2008 tax season in April of 2009, I stopped working for Nancy Hilton and no longer participated in her tax preparation scheme. During the period of time from January 2008 through April, 2009, I worked with Nancy Hilton and others who also prepared tax returns. As a result I have no idea how many tax returns were prepared or submitted to the IRS during this time period. I was never provided with any information concerning the number of tax returns prepared, how many were fraudulent or how many were actually submitted to the IRS. My part of the tax scheme was to prepare the tax returns for the clients that I was given, to remain silent and to not ask questions about any part of the business income or operations other than the work I was given to do.

6. I cannot express the amount of remorse I have felt for my actions. I have never been in any legal trouble prior to this and to this day cannot believe that I let myself willingly be talked into this behavior because of my need for money. I let my greed to increase my earnings overcome what I had been taught by my family and turned my back on the values in which I believed. I did this by telling myself that it was acceptable because I was the only one supporting my family. I had four children that lived with me that I supported and a husband out of work because of disabilities. I was also raising my husband's niece, Esthela Luera and her brother Adrian Luera because their own mother was unable to care for them. I was also supporting my son's, Alfonso's, girlfriend and their newborn son

who have remained living with me.

7. I still work as a letter carrier for the U.S. Post Office and also receive a certain amount monthly for Esthela Luera while she is living with me. My monthly income is:

| | |
|---|---|
| Wages from employment (prior to withholding) | $4,652.82 |
| Child support for Esthela | $658.00 |
| Social Security income for Esthela | $252.00 |
| Total | $5,562.82 |

However, my net wages after withholding is reduced to approximately $3,464.

8. It was this financial situation and being the only employed person in the household which contributed to my decision to engage in the illegal tax preparation business. I want to acknowledge that I understand that a very difficult financial situation is not an excuse to engage in illegal behavior and I accept full responsibility for my actions. The most inexcusable part is that I have jeopardized my job, my family and my reputation for $19,939 for 15-16 months of illegal activity.

9. It is my genuine desire that I be allowed to keep working to support my family and to pay my tax liability for my illegal earnings from the fraudulent tax returns which I kept and did not report as income.

Dated: November 1, 2015

Respectfully.

*Carmen Luera*

Carmen Luera

APPENDIX "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)

UNITED STATES OF AMERICA,  )
  )
v.  )    Case No.: 8:11-cr-00115-T-30-MAP
  )
TODD S. FARHA, et al.,  )
Defendants.  )
  )

BRIEF OF LAW PROFESSORS AND PRACTITIONERS AS *AMICI* IN
SUPPORT OF DEFENDANTS

Gregory R. Miller, Esq.
*Counsel of Record*
Beggs & Lane
215 South Monroe Street
Suite 710
Tallahassee, FL 32301
(850) 391-0001
grm@beggslane.com

Prof. Douglas A. Berman
The Ohio State University
Michael E. Moritz College of Law
55 West 12th Avenue
Columbus, OH 43210-1391
(614) 292-2631
berman.43@osu.edu

Prof. Stephen A. Saltzburg
George Washington University
School of Law
2000 H Street, N.W.
Washington, D.C. 20052
(202) 994-7089
ssaltz@law.gwu.edu

Prof. Jeffrey L. Fisher
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 724-7081
jfisher@stanford.edu

*[Additional Amici Listed on Following Page]*

Prof. Kate Stith
Yale Law School
P.O. Box 20815
New Haven, CT 06520
(203) 432-4835
Kate.Stith@yale.edu

Neal R. Sonnett, Esq.
Law Offices of Neal R. Sonnett, P.A.
2 South Biscayne Boulevard #2600
Miami, FL 33131
(305) 358-2000
nrslaw@sonnett.com

Prof. Bruce Green
Fordham University School of Law
140 West 62nd Street
New York, NY 10023
(212) 636.6851
bgreen@law.fordham.edu

Prof. Steven Wisotsky
Nova Southeastern Law School
Shepard Broad Law Center
Fort Lauderdale-Davie, FL 33314
(305) 322-5487
swisotskys@nsu.law.nova.edu

APPENDIX "2"

## INTERESTS OF AMICI

Amici are academics, lawyers in private practice, former and/or former government lawyers. The fairness of the sentencing process is a primary focus of their academic and professional interest. They have come together because they believe that this case highlights a serious problem facing federal sentencing judges today — namely, that the federal sentencing guidelines as currently written place too much emphasis on economic "loss" and too little emphasis on other factors that traditionally have been important factors in determining a fair and just sentence that takes full account of the factors set forth in 18 U.S.C. § 3553(a).

## EMPHASIS ON LOSS IS INCONSISTENT WITH 18 U.S.C. § 3553(a)

The loss table inevitably drives a court away, and distracts it, from focusing on the important statutory instructions that a sentence must be "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in §3553(a)(2). In Guideline calculations, which still serve as the starting point for federal sentencing decisions, the loss table dwarfs all other factors and distorts the assessment and impact of all other sentencing considerations. Yet, there is no reason to believe that Congress intended loss to overwhelm other considerations set forth in the statute. To the contrary, there is every reason to believe that the Guidelines' emphasis on loss undermines Congress's interest in a fair and balanced sentencing decision.

Amici submit that loss (actual or intended) as calculated according to the

1

APPENDIX "2"

Guidelines:

 (1) is simply one aspect of the "nature and circumstances of the offense" and will not reflect or incorporate other more important sentencing factors;

 (2) frequently will not "reflect the seriousness of the offense" and can often overstate its seriousness;

 (3) does not help a court decide how "to promote respect for the law" and may undermine respect for the law by producing mechanical sentences based on manufactured and inflated numbers disconnected from the offender's culpability;

 (4) does not produce "just punishment for the offense" in many cases and may result in advisory Guideline sentencing ranges that are illogical and indefensibly high;

 (5) poorly addresses the need "to afford adequate deterrence to criminal conduct" and may undermine deterrence by focusing on only one, and not always the most important one, of several possible motivations for criminal acts;

2

APPENDIX "2"

(6) will often be irrelevant to the goal of "protect[ing] the public from further crimes of the defendant" and may lead to excessive, unjust and unnecessary prison terms for defendants who pose no or little danger to the public;

(7) may operate, perversely, to preclude or undermine any needed training or correctional treatment given that prison terms may negate the benefits of training and treatment;

(8) may operate, perversely, to preclude or undermine the need "to impose similar punishment on similar offenders" because it can lead to similar Guideline-recommended ranges for offenses involving distinct defendants with disparate motives who produced very different harms to distinct types of individuals and institutions;

(9) and may hinder the opportunity for victims of economic offenses to receive full restitution by effectively preventing offenders from being able to make restitution payments.

Simply put, amici believe that the emphasis on loss in modern Guideline calculations cannot be reconciled with the structure and intent of §3553 and necessarily requires district judges to look to other offense factors in order to properly discharge their statutory sentencing obligations.

3

    Amici here are echoing points made by academics and practitioners in various ways for years. A leading academic has stated that the "rules governing high-end federal white-collar sentences are now completely untethered from both criminal law theory and simple common sense." Frank Bowman, *Sacrificial Felon: Life Sentences For Marquee White-Collar Criminals Don't Make Sense*, American Lawyer, Jan. 2007, at 63. Indeed, even former federal prosecutors — and a former general counsel to the FBI — acknowledge that "the current Federal Sentencing Guidelines for fraud and other white-collar offences are too severe" and appear much greater than "necessary to satisfy the traditional sentencing goals of specific and general deterrence — or even retribution." Andrew Weissmann & Joshua Block, *White-Collar Defendants and White-Collar Crimes*, 116 Yale L.J. Pocket Part 286 (2007), http://thepocketpart.org/2007/02/21/weissmann_block.html.

    In many cases, federal judges have refused to impose sentences recommended by Guidelines calculations driven by the loss table. Indeed, in most cases involving losses amounts that inflate Guideline ranges, federal judges feel statutorily required, in light of the instructions of Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, now to sentence white-collar offenders below the guideline range because they readily recognize that the loss table often will result in recommended sentences that are much too high.

4

## FEDERAL JUDGES REGULARLY REJECT RECOMMENDED
## GUIDELINE SENTENCES INFLATED BY LOSS CALCULATIONS

Since the Supreme Court in *Booker* remedied constitutional problems by making the guidelines advisory, more and more judges regularly recognize the need to reject the Guidelines for fraud offenses as a fair benchmark for just and effective federal sentences. Statistics recently released by the United States Sentencing Commission reveal that, from October 1, 2012 through September 30, 2013, federal district judges imposed sentences in approximately 8,196 cases in which Guideline ranges were calculated pursuant to the fraud guidelines set out in U.S. Sentencing Guidelines Manual §2B1.1. Fewer than half of all these cases (4,077) resulted in a sentence imposed within the calculated guideline range. In about 40% of these other cases, the government requested a below guideline sentence based on the defendant's cooperation or other factors and in well over 2,000 cases judge on their own initiative determined they should depart or vary downward from the sentenced recommended by §2B1.1.

In the many cases in which the government had recommended, or a judge has independently determined, that a sentence below the Guideline range is appropriate, the actual imposed sentence is often far below the sentence recommended by the Guidelines. In the more than 1300 cases from Fiscal Year 2013 involving 5K1.1 substantial assistance motions in which the government recommended a below-Guideline sentence, the median sentence actually imposed was twelve months, a full 18 months less than the average calculated guideline minimum (or a median percent decrease of 70%). Similarly, in the more than 1,500 cases involving sentences below

5

the guideline range as a result of a judicial judgment based on *Booker*, the median sentence was also 12 months, a full 12 months below the average calculated guideline minimum (or a median percent decrease of 53%).

These data demonstrate widespread judicial disaffinity for the extreme sentences often produced under the Guidelines, and they are supported by a recent sophisticated empirical analysis of sentences imposed by federal judges in fraud cases that has documented the role loss plays in fraud cases. This analysis found, not surprisingly, that "judges are more likely to disagree with Guideline recommendations in fraud cases that are driven substantially by loss." Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Federal Sentencing Reporter 19, 26 (2013)

### FEDERAL JUDGES HAVE PERSUASIVELY EXPLAINED WHY THE LOSS TABLE IS PROBLEMATIC

Days after the Supreme Court rendered the Guidelines advisory through its *Booker* decision, U.S. District Judge Lynn Adelman in *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005), provided a thorough explanation for why sentencing factors beyond "loss" should and must take on a greater role in light of the statutory instructions Congress set forth in 18 U.S.C. § 3553(a). The defendant in *Ranum* was a bank official who made unauthorized loans to a start-up corporation, GLC, and lied to the bank about it. He did not act out of a desire for personal profit. Due to the role of loss in the Guideline calculation, the Guidelines called for a sentence of more than 3 to 4 years of imprisonment. The defendant

6

argued for a period of home confinement, and Judge Adelman decided that the appropriate sentence was imprisonment for a year and a day.

Judge Adelman explained his sentence as follows based on the §3553(a) factors stressed by Congress in its instructions to sentencing judges:

> I determined that the factors set forth in § 3553(a) fell into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense. I analyzed each category and in so doing considered the specific statutory factors under § 3553(a), including the advisory guidelines.

> First, I considered the nature of the offense. The offense was serious for several reasons, the primary one being the amount of the loss. * * *

> However, defendant's culpability was mitigated in that he did not act for personal gain or for improper personal gain of another. * * *

>                  * * *

> I then considered the second general category -- the history and character of defendant. The factors in this category weighed heavily in defendant's favor. He is fifty years old, had no prior record, a solid employment history, and is a devoted family man. He has two children, one of whom is still in school. * * *

>                  * * *

> I also noted that defendant's conviction had significant collateral effects on him. After his termination by State Financial Bank, defendant obtained a good job at Anchor Bank. As a result of the conviction he lost that job and will be unable to work in banking again.

> Under all of the circumstances, I concluded that defendant is not a danger to society and is highly unlikely to reoffend.

> Finally, I considered the needs of the public and the victim. Because the case was so unusual, I doubted whether a prison sentence

7

would have much value as a deterrent. * * *

*Id.* at 989-91 (footnotes omitted and emphasis added). *See also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (complaining that the "[Sentencing] Guidelines place undue weight on the amount of loss involved in the fraud" given that often "the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

Similarly, in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), U.S. District Judge Jed Rakoff stressed the limited import and value of loss metrics when he sentenced the Chief Operating Officer and President of Impath, Inc. — a public company specializing in cancer diagnosis testing. The charges against the defendant involved a scheme to inflate Impath's stock, and the government argued, based on loss calculations, that the Guidelines called for a sentence of life imprisonment.

Judge Rakoff imposed a non-guideline sentence of 42 months' imprisonment, plus restitution, forfeiture, supervised release and a lifetime ban being an officer or director of a public company. Judge Rakoff explained why an inordinate emphasis on loss should not drive the sentence that he imposed:

> * * * The offense here was egregious: an accounting fraud extending over several years that had an intended loss of more than $ 50 million. But, as the Government conceded, Adelson was not the originator of the fraud; and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months. During the time of his participation, the price of Impath's stock was not further inflated. * * *

* * *

8

As for "the history and characteristics of the defendant," it was undisputed at the time of sentencing that Adelson's past history was exemplary. * * *

* * *

What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss. As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. * * *

*Id.* at 509, 512-13 (emphasis added).

Judge Rakoff had more to say about loss in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), in which Gupta was convicted of one count of conspiracy and three counts of substantive securities fraud for providing material non-public information to Raj Rajaratnam:

It may be worth remembering that the Sentencing Guidelines were originally designed to moderate unwarranted disparities in federal sentencing by enacting a set of complicated rules that, it was hypothesized, would cause federal judges to impose for any given crime a sentence approximately equal to what empirical data showed was the average sentence previously imposed by federal judges for that crime. * * * From almost the outset, however, the Guidelines deviated from this goal. * * *

* * * [T]he numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology -- thus maximizing the risk of injustice.

9

\* \* \*

In fairness, this vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom. But in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*Id.* at 350-51 (emphasis added).

In *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), the Second Circuit examined the sentences imposed on three defendants involved in a conspiracy to defraud a non-existent investor of three billion dollars. The court of appeals remanded for re-sentencing because of procedural error, and District Judge Stefan Underhill concurred to add these words:

In my view, the loss guideline is fundamentally flawed, and those flaws are magnified where, as here, the entire loss amount consists of intended loss. Even if it were perfect, the loss guideline would prove valueless in this case, because the conduct underlying these convictions is more farcical than dangerous. \* \* \* The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases.

*Id.* at 377-78 (emphasis added).

## A BETTER WAY TO APPROACH SENTENCING IN FRAUD CASES

The Sentencing Commission itself has expressed concern about the way loss

10

APPENDIX "2"

drives sentences under the Guidelines. It invited a number of individuals to join a discussion about sentencing in economic crimes cases in October 2013. In preparation for that meeting, a Task Force assembled by the American Bar Association Criminal Justice Section drafted an alternative approach that judges could use in sentencing defendants in fraud cases and the Commission could use as a model to improve Guidelines for economic crime cases. The Task Force presented the draft to the Commission during the October discussion.[2]   Amici believe that it is more consistent with the requirements of 18 U.S.C. § 3553 (a) than the current Guidelines.

The Task Force focused on the structural framework of the Guidelines and opined as follows:

> This structural framework is not ideal because it can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

The ABA Task Force focused its proposed alternative Guideline on more dynamic substantive considerations and on measures of "culpability" that are more consistent with the §3553(a) factors:

> The Guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which

---

[2] http://www.ussc.gov/Research_and_Statistics/Research_Projects/Economic_Crimes/201 30918-19_Symposium/Plenary_Session_III_Report.pdf

11

the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others, and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive. Other factors may also bear on the culpability level.

## CONCLUSION

The data gathered by the Sentencing Commission demonstrate that federal judges throughout the country recognize that reliance on loss drives sentences to extreme and inappropriate highs and to levels that fail to take account of all of the 18 U.S.C. § 3553(a) factors; these judges are choosing to impose sentences that consider loss but that do not permit loss alone (and in conjunction with other problematic upward adjustments) in the Guidelines to result in unreasonably high sentences. The Sentencing Commission itself has recognized that there are problems how the Guidelines operate in economic crime cases, but formally changing the Guidelines is a slow process that can take years to complete.

Fortunately, since *Booker*, federal courts have not only the discretion, but also an obligation, to impose sentences that are consistent with 18 U.S.C. § 3553(a) and that are "sufficient, but not greater than necessary," to promote the sentencing purposes set forth in the statute. Your Honor does not have to wait for the Guidelines to be revamped, and, indeed, amici respectfully suggest you cannot wait if you are to meet the responsibilities imposed upon you by 18 U.S.C. § 3553(a). Your Honor has full authority to do justice and to consider loss as a factor in sentencing but not as

12

the most important factor in every case, including this case.

Accordingly, amici urge that the court give appropriate consideration to the amount of the loss in this case, but not permit loss to drive the defendants' sentences to levels that are unreasonable when considered in connection with all of the factors set forth in 18 U.S.C. § 3553 (a). In sum, amici suggest that a below-guidelines sentence is appropriate in this case, as is many cases in which the loss table, in combination with other enhancements, greatly overstates the culpability of the defendants.

Respectfully submitted,

_s/Gregory R. Miller_ ___ ___
Gregory R. Miller, Esq.
*Counsel of Record*
Beggs & Lane, RLLP
215 South Monroe Street
Suite 710
Tallahassee, FL 32301
(850) 391-0001
grm@beggslane.com

*[Additional Amici Listed on Following Page]*

13

## ADDITIONAL *AMICI*

Prof. Stephen A. Saltzburg
George Washington University
School of Law
2000 H Street, N.W.
Washington, DC 20052
(202) 994-7089
ssaltz@law.gwu.edu

Prof. Jeffrey L. Fisher
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 724-7081
jfisher@stanford.edu

Prof. Bruce Green
Fordham University School of Law
140 West 62nd Street
New York, NY 10023
(212) 636-6851
bgreen@law.fordham.edu

Prof. Steven Wisotsky
Nova Southeastern Law School
Shepard Broad Law Center
Fort Lauderdale-Davie, FL 33314
(305) 322-5487
wisotskys@nsu.law.nova.edu

Prof. Douglas A. Berman
The Ohio State University
Michael E. Moritz College of Law
55 West 12th Avenue
Columbus, OH 43210-1391
(614) 292-2631
berman.43@osu.edu

Prof. Kate Stith
Yale Law School
P.O. Box 208215
New Haven, CT 06520
(203) 432-4835
Kate.Stith@yale.edu

Neal R. Sonnett, Esq.
Law Offices of Neal R. Sonnett, P.A.
2 South Biscayne Boulevard, #2600
Miami, FL 33131
(305) 358-2000
nrslaw@sonnett.com

14

APPENDIX "2"

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of May 2014, I caused a copy of the foregoing Motion for Leave to File "Brief of Professors and Practitioners as *Amici* in Support of Defendants" to be served on the following via the Court's electronic filing system:

Jay G. Trezevant, Esq., Cherie L. Krigsman, Esq., Natalie H. Adams, Esq., John A. Michelich, Esq., and John J. Bowers, Esq.
Attorneys for the Government

John F. Lauro, Esq., Michael G. Califano, Esq., and Todd J. Cooper, Esq.
Attorneys for Paul L. Behrens

Peter E. George, Esq., Douglas J. Titus, Jr., Esq., L. Barrett Boss, Esq., and Laura L. Vaughan, Esq.
Attorneys for Todd S. Farha

Morris Weinberg, Jr., Esq., Jack E. Fernandez, Esq., D. Lee Fugate, Esq., Marcos E. Hasbun, Esq., and Nathan M. Berman, Esq.
Attorneys for Thaddeus M. S. Bereday

William F. Jung, Esq., and Paul M. Sisco, Esq.
Attorneys for Peter E. Clay

Robert A. Leventhal, Esq., Stanley J. Reed, Esq., Lauri E. Cleary, Esq., and Patrick M. Donahue, Esq.
Attorneys for William L. Kale

*s/ Gregory R. Miller*
Gregory R. Miller, Esq.
*Counsel of Record*
Beggs & Lane, RLLP
215 South Monroe Street
Suite 710
Tallahassee, FL 32301
(850) 391-0001
grm@beggslane.com